# EXHIBIT 1

| Summons | CIVIL DOCKET NO.<br>2484cv 01736 | Trial Court of Massachusetts<br>The Superior Court |
|---|---|---|
| CASE NAME:<br>MAST HILL FUND, L.P.,<br>Plaintiff(s)<br>vs.<br>AMERICAN INTERNATIONAL HOLDINGS, CORP., JACOB COHEN, and MANGOCEUTICALS, INC.,<br>Defendant(s) | | John E. Powers III — Acting Clerk of Courts<br>Suffolk County<br>COURT NAME & ADDRESS:<br>Suffolk Superior Civil Court<br>Three Pemberton Square<br>Boston, MA. 02108 |

THIS SUMMONS IS DIRECTED TO   AMERICAN INTERNATIONAL HOLDINGS, CORP.   (Defendant's name)

You are being sued. The Plaintiff(s) named above has started a lawsuit against you. A copy of the Plaintiff's Complaint filed against you is attached to this Summons and the original Complaint has been filed in the _____ Court.

**YOU MUST ACT PROMPTLY TO PROTECT YOUR RIGHTS**HOLDINGS, CORP.

**1. You must respond to this lawsuit in writing within 20 days.**

If you do not respond, the Court may decide the case against you and award the Plaintiff everything asked for in the Complaint. You will also lose the opportunity to tell your side of the story. You must respond to this lawsuit in writing even if you expect to resolve this matter with the Plaintiff. **If you need more time to respond, you may request an extension of time in writing from the Court.**

**2. How to Respond.**

To respond to this lawsuit, you must file a written response with the Court **and** mail a copy to the Plaintiff's attorney (or the Plaintiff, if unrepresented). You can do this by:

a) Filing your **signed original** response with the Clerk's Office for Civil Business, _____ Court (address), by mail, in person, or electronically through the web portal www.eFileMA.com if the Complaint was e-filed through that portal, **AND**

b) Delivering or mailing **a copy** of your response to the Plaintiff's attorney/Plaintiff at the following address:

**3. What to Include in Your Response.**

An "Answer" is one type of response to a Complaint. Your Answer must state whether you agree or disagree with the fact(s) alleged in each paragraph of the Complaint. Some defenses, called affirmative defenses, must be stated in your Answer or you may lose your right to use them in Court. If you have any claims against the Plaintiff (referred to as "counterclaims") that are based on the same facts or transaction described in the Complaint, then you must include those claims in your Answer. Otherwise, you may lose your right to sue the Plaintiff about anything related to this lawsuit. If you want to have your case heard by a jury, you must **specifically** request a jury trial in your Court no more than 10 days after sending your Answer.

3. (cont.) Another way to respond to a Complaint is by filing a "Motion to Dismiss," if you believe that the Complaint is legally invalid or legally insufficient. A Motion to Dismiss must be based on one of the legal deficiencies or reasons listed under **Rule 12 of the Massachusetts Rules of Civil Procedure**. If you are filing a Motion to Dismiss, you must follow the filing rules for "Civil Motions in Superior Court," available at:

www.mass.gov/law-library/massachusetts-superior-court-rules

4. **Legal Assistance.**

You may wish to get legal help from a lawyer. If you cannot get legal help, some basic information for people who represent themselves is available at www.mass.gov/courts/selfhelp.

5. **Required Information on All Filings.**

The "Civil Docket No." appearing at the top of this notice is the case number assigned to this case and must appear on the front of your Answer or Motion to Dismiss. You should refer to yourself as the "Defendant."

Witness Hon. Michael D. Ricciuti , Chief Justice on _____ , 20____ . (Seal)

Acting Clerk _____

Note: The docket number assigned to the original Complaint by the Clerk should be stated on this Summons before it is served on the Defendant(s).

PROOF OF SERVICE OF PROCESS

I hereby certify that on _____ , I served a copy of this Summons, together with a copy of the Complaint in this action, on the Defendant named in this Summons, in the following manner (See Rule 4(d)(1-5) of the Massachusetts Rules of Civil Procedure):

_____

_____

_____

Dated: _____          Signature: _____

N.B. **TO PROCESS SERVER:**

**PLEASE ENTER THE DATE THAT YOU MADE SERVICE ON THE DEFENDANT IN THIS BOX - BOTH ON THE ORIGINAL SUMMONS AND ON THE COPY OF THE SUMMONS SERVED ON THE DEFENDANT.**

Date: _____

rev. 1/2023

COMMONWEALTH OF MASSACHUSETTS

SUFFOLK, SS                                             SUFFOLK SUPERIOR COURT

DOCKET NO. 2484cv01736

| |
|---|
| MAST HILL FUND, L.P.,<br>    Plaintiff,<br><br>v.<br><br>AMERICAN INTERNATIONAL<br>HOLDINGS, CORP., JACOB COHEN,<br>and MANGOCEUTICALS, INC.,<br><br>    Defendants. |

## AMENDED COMPLAINT

### Introduction

1. Mast Hill Fund, L.P. ("Mast Hill") brings this Complaint after Jacob Cohen, the former CEO of American International Holdings Corp. ("AMIH") engineered a scheme to strip AMIH of its fundamental businesses so that another company under his control, Mangoceuticals, Inc. ("Mango") could reap the benefits.

2. In doing so, AMIH defaulted on three promissory notes it had executed with Mast Hill. Mast Hill provided AMIH with funds totaling $874,500.00 in good faith, while it complied with all of its obligations pursuant to the parties' agreements.

3. Consequently, Mast Hill now asserts claims against Cohen, stemming from his fraudulent scheme, against Mango and Cohen for tortious interference with Mast Hill's contractual relationship with AMIH, and against AMIH for defaulting on its contractual obligations to Mast Hill.

4. Specifically, Mast Hill asserts claims against AMIH for:

1

      a. Breach of contract;

      b. Breach of implied covenant of good faith and fair dealing;

      c. Unjust enrichment.

      d. Money had and received.

5. Mast Hill also asserts claims against Cohen for fraud and against Cohen and Mango for tortious interference with contractual relationship.

## I. PARTIES

6. Mast Hill Fund, L.P., is a Delaware Limited Partnership with a principal place of business in Wellesley, MA.

7. AMIH is a Nevada corporation with a principal place of business in Electra, Texas.

8. Cohen is an individual residing in Dallas, Texas.

9. Mango is a Texas corporation with a principal place of business in Dallas, Texas.

## II. JURISDICTION AND VENUE

10. The Court has jurisdiction over this matter because it is a matter relating to the liability of an officer, involves claims of business torts, including fraud and tortious interference with contracts, the tortious activity was directed at a Massachusetts-based company, and the amount in controversy exceeds $75,000.

11. Venue is proper in this Court in that, pursuant to the Transaction Documents (defined below), Mast Hill and AMIH agreed that all disputes them relating to the promissory notes shall be brought, *inter alia*, in the state or federal courts in the Commonwealth of Massachusetts. This Court is also in the district where Mast Hill is headquartered and has its principal place of business and is where the violative conduct is alleged to have occurred.

## III.     FACTS

### AMIH's Business

12. AMIH is a publicly-traded company on the OTC markets. At the time Mast Hill was persuaded to fund AMIH, AMIH operated as a holding company, aimed assembling companies that could work together to produce telehealth channels for consumers.

13. To accomplish this, AMIH operated as an investor, developer and asset manager diversified across the healthcare supply chain. The AMIH portfolio encompassed telemedicine and other virtual health platforms, subscriber based primary care and concierge medicine plans, preventative care solutions and wellness related assets such as proprietary nutrition-based products, mental & behavioral health services as well as its own proprietary life coaching platform. AMIH provided these services through direct-to-consumer and business-to-business distribution channels.

14. The companies in AMIH that served as the main "workhorses" for AMIH were ZipDoctor, Inc. and Epiq Scripts, LLC. ZipDoctor is a telemedicine companies that operated nationally to allow patients in any state to quickly obtain prescriptions for some of the products in AMIH's portfolio. Epiq Scripts compounded AMIH pharmaceuticals, then branded and packaged them and shipped them to customers. Together, the companies were a seamless team that marketed, prescribed, produced, and shipped products to consumers across the country.

### The November 22, 2021 Transaction (the "November Transaction")

14. In late 2021, Mast Hill was persuaded to help fund AMIH through a promissory note. Thus, on November 22, 2021 AMIH and Mast Hill executed, *inter alia*, a Securities Purchase Agreement (the "November Mast Hill SPA")(Exhibit 1) and AMIH executed a

3

$750,000 Convertible Promissory Note made payable to Mast Hill (the "November Mast Hill Note")(Exhibit 2). (The November Mast Hill SPA, the November Mast Hill Note, and other documents executed at closing are collectively the "November Mast Hill Transaction Documents").

**Cohen and Mangoceuticals Inc. Scheme to Strip AMIH of its Assets**

15. In May 2022, Cohen, the CEO of both AMIH and Mango, approached Mast Hill with a proposal to radically alter AMIH's business plan. (Exhibit 3) In telephone calls and emails with Patrick Hassani at Mast Hill, Cohen explained that he believed Mango could become a viable independent entity focused on men's sexual health issues. However, he disclosed, he was unable to raise money for it within the AMIH portfolio and needed break it off from AMIH.

16. Cohen proposed that AMIH divest itself of Mango, one of its portfolio companies, along with AMIH's two "workhorse" companies, Zip Doctor and Epiq Scripts. He assured Hassani that these divestiture would only happen through an "arms length transaction." (*Id.*)

17. AMIH needed Mast Hill's approval to do this because Section 2.5 and 2.8 of the November Mast Hill Note precluded AMIH from selling its assets (Section 2.5) and required instead that it preserve them (Section 2.8).

18. When Mast Hill refused to approve of the divestiture of all three companies, Cohen pivoted and sought Mast Hill's approval only for the divestiture of Mango.

19. Conceptually, there was nothing prohibiting AMIH from holding an IPO of Mango as a subsidiary of AMIH.. However, Cohen assured Hassani that Mango had little value, given that Cohen had no concrete plans for the company. In light of the state of its market and

product development, Cohen told Hassani, Mango's value was only in the range of the $90,000 that AMIH had ascribed to it.

20. Mango planned to market erectile dysfunction drugs. This business plan meant that Mast Hill would not be harmed by spinning off Mango, Cohen told Hassani, because Mango would rely on AMIH's "workhorse" companies, ZipDoctor and Epiq Scripts to carry out Mango's customers' orders – ZipDoctor would locate doctors to provide prescriptions and Epiq Scripts would compound, package and ship the products to the customers. In this way, AMIH stood to benefit directly Mango's business.

21. As it stood at the time, however, Mango was essentially a company with a potential product but no funds, whose future would depend upon its ability to raise capital for operations and product development, Cohen told Hassani.

22. Relying on Cohen's representations to Hassani, on June 2, 2022, Mast Hill executed the waiver Cohen had requested (Exhibit 4)(the "Waiver"). Cohen Enterprises, Inc. an entity controlled by Cohen, then purchased Mango from AMIH for $90,000.

23. In fact, while Cohen was making these representations to Mast Hill, Cohen knew that Mango had already decided to engage Boustead Securities, LLC ("Boustead"), if it had not done so already, to act as underwriter's representative of a private placement offering pursuant to Regulation D under the Securities Act of 1933 (Exhibit 5).

24. Within 75 days of the execution of the waiver, Mango sold 1,500,500 units, consisting of one share of common stock and one warrant ($1 exercise price) for $1,500,500 (Exhibit 7). At the time Cohen pulled Mango out from AMIH, he received 8,000,000 shares in Mango. This results in a valuation of $8M, far above the $90,000 valuation Cohen had described for Mast Hill in connection with the "arms length" transaction he

said would take place.

25. In those 75 days between the waiver's execution and mid-September, no revenue was generated nor any significant business development in Mango to warrant the increase in value. Yet during that time, the 1,500,500 units in Mango were sold.

26. At no point did Cohen advise Mast Hill that he was in the process of preparing Mango for an Initial Public Offering, which in fact occurred in March 2023.

27. Both in his role as CEO of AMIH, and as CEO of Mango, Cohen deliberately misled Mast Hill for the purpose of inducing it to grant the Waiver.

### The August 29, 2022 Transaction (The "August Transaction")

28. In August 2022, Cohen contacted Hassani at Mast Hill and stated that AMIH stood in perilous financial condition. Without funds, he told Hassani, AMIH would likely have to cease operations. Cohen never mentioned to Hassani that he was already well down the road to successfully raising funds for Mango, a company to which he had chosen to dedicate the majority of his time. In effect, he was asking Mast Hill to provide AMIH funds so that he could dedicate his efforts to Mango after he made affirmative misrepresentations to Hassani and concealed the true state of Mango's finances and operations from Mast Hill.

29. Reasonably relying on Cohen's representations, Mast Hill agreed to provide the financing Cohen requested. On August 29, 2022, AMIH and Mast Hill executed, *inter alia*, a Securities Purchase Agreement (the "August Mast Hill SPA")(Exhibit 7) and AMIH executed a Convertible Promissory Note made payable to Mast Hill (the "August Mast Hill Note")(Exhibit 8). The August Mast Hill SPA, the August Mast Hill Note, and other documents executed at closing are collectively the "August Mast Hill Transaction

Documents"). The August Mast Hill Note was in the original principal amount of $62,500. Mast Hill funded this investment on August 31, 2022.

**The September 13, 2022 Transaction (The "September Mast Hill Transaction")**

30. After the August Mast Hill Transaction, Cohen advised Mast Hill that AMIH required even more funds. To lure Mast Hill into providing more money, Cohen explained that AMIH needed the funds to pay its legal and auditors' bills so that it could stay in good standing. He added that Epiq was in the process of getting the regulatory approvals it needed from multiple states so that it could provide pharmacy services. According to Cohen, those approvals would greatly increase Epiq's value and, thus, increase AMIH's value.

31. Unknown to Mast Hill at the time, Cohen and Mango had further developed their scheme and intended to convince AMIH to divest itself of both Epiq and Zip Doctor. In effect, Cohen and Mango sought to have Mast Hill fund the continued existence of Epiq and Zip Doctor while they finalized their plans to obtain them for Mango for no value.

32. Again reasonably relying on Cohen's representations, Mast Hill agreed to provide AMIH its further funding. On September 13, 2022, AMIH and Mast Hill executed, *inter alia*, a Securities Purchase Agreement (the "September Mast Hill SPA")(Exhibit 9) and AMIH executed a Convertible Promissory Note made payable to Mast Hill (the "September Mast Hill Note")(Exhibit109). The September Mast Hill SPA, the September Mast Hill Note, and other documents executed at closing are collectively the "September Mast Hill Transaction Documents"). The September Mast Hill Note was in the original principal amount of $62,500. Mast Hill funded this investment on September 15, 2022.

### AMIH Divests Itself of Epiq and Zip Doctor

33. In its Form 8K filed on February 15, 2023, AMIH revealed that it had entered into an agreement with Cohen whereby it transferred its interests in Epiq and Zip Doctor to an entity controlled by Cohen (Exhibit 11).

34. AMIH received inadequate consideration for these transfers. It also failed to obtain permission from Mast Hill for them, as required.

### Cohen and Mangoceuticals Take on Epiq and Zip Doctor as Mangoceuticals' chief assets

35. Once Cohen gained control over Epiq and Zip Doctor, he and Mango used these key companies for Mango's own business.

36. In a July 23, 2023 interview, Cohen touted Mango's control over Zip Doctor and Epiq as a key reason why Mango's business is successful, for the exact same reason that they were so crucial for AMIH – they provided a seamless stream of synergy, from prescription to production to branding to shipping. *See* NST, New to the Street, avail. at < https://vid.cdn-website.com/b134fb9a/videos/nbMCDc7nRySby2iaXVjD_Video+Jul+20+2023%2C+12+10+08+PM+%281%29+%281%29-v.mp4>.

37. While Mango benefitted from AMIH's former assets, AMIH never received a revenue boost from the companies, as Mast Hill had been led to expect. Instead, AMIH was left to flounder without any ability to carry out its business plan.

### The Promissory Notes

38. Mast Hill provided the funding in each of the Promissory Notes identified above.

39. Each of the Promissory Notes include the following bargained-for terms:

8

a. The interest rate is set at 12%, with default interest set at the lesser of 16% or the maximum amount permitted by law.

b. The maturity date is one year from the date of execution.

c. Section 1.1 grants Mast Hill the right to convert all or any portion of outstanding principal and interest into fully paid shares of Common Stock.

d. Section 1.2 sets the share price for any such conversion.

e. Section 1.3 identifies the requirement that AMIH set aside sufficient shares for Mast Hill to exercise its conversion rights.

f. Section 2.5 requires AMIH to get Mast Hill's permission before selling its assets.

g. Section 2.8 requires AMIH to preserve its business and assets.

h. Section 3.2 identifies a failure to allow for conversion to be a default on the terms of the Note.

i. Section 3.3 provides that a breach by AMIH of any covenant or agreement between the parties to be an event of default.

j. Section 3.8 provides that a failure to comply with the 1934 Act shall be an event of default.

k. Section 3.17 provides that it shall be an event of default if Mast Hill is unable to obtain a Rule 144 letter regarding the conversion of shares.

l. Section 3.20 provides that it shall be an event of default if AMIH has failed to uplist its shares for trading upon the NYSE American, the Nasdaq Capital Market, the Nasdaq Global Market, the Nasdaq Global Select Market, the New York Stock Exchange, or any other national securities exchange (or any successors to any of the foregoing) within 220 days of the execution of the Note.

   a. Section 4.5 provides that AMIH shall be responsible for Mast Hill's costs of collection.

   b. Section 4.6 provides that the law of Nevada is selected as the governing law, and the state and federal courts of Massachusetts are designated the appropriate venue.

   c. Section 4.12, entitled "Usury," provides the following:

   > "total liability of the Company under this Note for payments which under the applicable law are in the nature of interest shall not exceed the maximum lawful rate authorized under applicable law (the "Maximum Rate"), and, without limiting the foregoing, in no event shall any rate of interest or default interest, or both of them, when aggregated with any other sums which under the applicable law in the nature of interest that the Company may be obligated to pay under this Note exceed such Maximum Rate"

40. Nevada law, which the parties agreed governs this case, contains no prohibition against so-called usurious transactions.

41. AMIH has breached the terms of each of the promissory notes by:

   a. Failing to make payment in full within one year.

   b. Failing to comply with the conversion terms of the notes (Sections 1.1, 1.2, 1.3, 3.2, 3.17).

   c. Failing to get permission to sell assets, and failing to preserve the same. (Sections 2.5, 2.8).

   d. Failing to uplist shares (Section 3.2).

## Amounts Owed

42. As of June 21, 2024, AMIH owes the following in connection with the November Mast Hill Transaction:

   a. Principal:        $515,217.82

   b. Interest:         $113,150.33

      c. Default: $164,795.79

      d. TOTAL: $793,163.94

37. As of June 21, 2024, AMIH owes the following in connection with the August Mast Hill Transaction:

      a. Principal: $62,250.00

      b. Interest: $16,563.64

      c. Default charges: $16,647.19

      d. TOTAL: $95,460.83

38. As of June 21, 2024, AMIH owes the following in connection with the September Mast Hill Transaction:

      a. Principal: $62,250.00

      b. Interest: $15,110.58

      c. Default charges: $16,570.44

      d. TOTAL: $93,931.02

## COUNT I
## BREACH OF CONTRACT
## MAST HILL V. AMIH

39. Mast Hill repeats and realleges each of the foregoing paragraphs as if explicitly stated here.

40. For good and valuable consideration, Mast Hill entered into the November Mast Hill Transaction, the August Mast Hill Transaction, and the September Mast Hill Transaction.

41. Mast Hill complied with each of its obligations in the Mast Hill Transaction identified herein.

42. As described above, and as in fact occurred, AMIH has breached its obligations in connection with each of the Mast Hill Transactions identified herein.

43. As a direct and proximate result of AMIH's breaches of contract, Mast Hill has been harmed.

## COUNT II
## BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING
## (MAST HILL V. AMIH)

44. Mast Hill repeats and realleges each of the foregoing paragraphs as if explicitly stated here.

45. It is well established that every contract carries an implied covenant of good faith and fair dealing whereby the parties treat each other fairly and act in good faith and no party to the contract shall take any action to harm another party's rights under the contract. The duty imposed by this "implied covenant of good faith and fair dealing" pertains to bad faith in the performance of a contract, not just in its execution or negotiation. Implicit in every contract is the requirement on faithfulness to an agreed upon common purpose and consistency with the justified expectations of the other party.

46. AMIH had a duty of good faith and fair dealing in its dealings with Mast Hill and pursuant to the promises, contracts, and statements made to Mast Hill to induce it to enter into the contracts and provide assets to AMIH in exchange for its promise to repay the same, with interest.

47. Under the covenant, AMIH was obligated to a good faith performance of its obligations under the Purchase Agreements and the Notes with Mast Hill, and to be faithful and consistent to the justified expectations of Mast Hill.

48. As described above, AMIH breached the implied covenant of good faith and fair dealing

with Mast Hill.

49. As a direct and proximate cause of AMIH's breaches of the implied covenant of good faith and fair dealing, Mast Hill has suffered harm.

## COUNT III
## MONEY HAD AND RECEIVED
## (MAST HILL V. AMIH)

50. Mast Hill repeats and realleges each of the foregoing paragraphs as if explicitly stated herein.

51. AMIH received money belonging to Mast Hill.

52. AMIH benefitted from the receipt of the money.

53. Pursuant to principles of equity and good conscience, Mast Hill is entitled to a return of its funds.

## COUNT IV
## FRAUD IN THE INDUCEMENT
## MAST HILL V. COHEN

54. Mast Hill repeats and realleges each of the foregoing paragraphs as if explicitly stated herein.

55. Cohen made material misrepresentations of fact intending to induce Mast Hill to enter into the Waiver. Cohen was aware of these material misrepresentations of fact and made them for the purpose of inducing Mast Hill to take actions it would not otherwise have taken.

56. By making the material misrepresentations of fact, and inducing Mast Hill to enter into the Waiver, Cohen benefited directly and individually.

57. Mast Hill reasonably relied upon the material misrepresentations of fact made by Cohen in agreeing to enter into the Waiver.

13

58. Had Mast Hill known that Cohen was being untruthful, Mast Hill would not have entered into the Waiver, nor would it have entered into the August or September Mast Hill transactions.

59. As a result of Cohen's fraudulent inducement, Mast Hill has been harmed.

## COUNT V
## TORTIOUS INTERFERENCE WITH CONTRACTUAL RELATIONSHIP
## MAST HILL V. COHEN

60. Mast Hill repeats and realleges each of the foregoing paragraphs as if explicitly stated herein.

61. Mast Hill had contractual agreements with AMIH.

62. Cohen knew about the agreements.

63. Cohen intentionally caused or persuaded AMIH to break its agreements with Mast Hill.

64. Cohen had an improper motive or used an improper method in interfering with the contractual agreements.

65. As a result of Cohen's actions, Mast Hill was harmed.

## COUNT VI
## TORTIOUS INTERFERENCE WITH CONTRACTUAL RELATIONSHIP
## MAST HILL V. MANGO

66. Mast Hill repeats and realleges each of the foregoing paragraphs as if explicitly stated herein.

67. Mast Hill had contractual agreements with AMIH.

68. Mango knew about the agreements.

69. Mango intentionally caused or persuaded AMIH to break its agreements with Mast Hill.

70. Mango had an improper motive or used an improper method in interfering with the contractual agreements.

71. As a result of Mango's actions, Mast Hill was harmed.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Mast Hill Fund L.P. respectfully prays for relief as follows:

1. That the Court enter judgment on its behalf on each count of its Complaint.

2. For an award of damages sufficient to compensate it for its damages, plus interest, costs and attorney's fees.

3. Such other relief as this Court deems just and appropriate.

Respectfully Submitted,
Mast Hill Fund, L.P.
By its Attorneys,

Timothy Cornell, BBO #654412
Cornell Dolan, P.C.
Ten Post Office Square, Suite 800 South
Boston, MA 02109
617-850-9036
*tcornell@cornelldolan.com*

DATE: